Good morning, your honors. My name is Chad Wright. I represent Daniel Brown in this matter. I'd like to reserve, because I've gotten a little additional time than I anticipated today, I still would like to reserve three minutes for remarks. You don't have to use it all. I don't have to use it all. I appreciate that. This case, or the appeal, starts out with an examination of the small connections that happens between these folks on this bulletin board, and that these small connections lead to bigger results for the government in a lot of ways. If we start with the search and seizure, I think we have at least a tacit admission that the initial intrusion onto the board through Mr. Crosby's account was not authorized. It certainly was done without a warrant. I'm sorry. Yes, onto the Dark Moon, or D-Moon. You're referring to Agent Felons? That is correct. Agent Felons in early April of 2013. Is there anything in the record that would show that the agent's interviews of Philip Morris, that's really the person's name, Tony Morris, my notes must be wrong, there's three different names. There's Charles Crosby, Philip Morris, and Tony. I think I have the last name wrong. Anyway, is there anything to show that there was taint from Felons' actions in these later interviews? Well, I think, it's my understanding there's no recordings of the latter two, but I've been focusing on Crosby and focused on Crosby in the briefing. So there is a recorded interview of Crosby. And then if you also look at the government supplemental excerpts of records, there are these advance sheets that go out to folks that are interviewing materials. And the advance sheet does not include the reference to D-Moon. It says, tell us about your other social media. Tell us about your other accounts. But when you listen to the tape of the interview with Mr. Crosby, the first question is, tell me about D-Moon. And so I think that's the taint, right? When an FBI agent tells you about a specific thing, and the name itself doesn't mean anything, right, Dark Moon or D-Moon, but that's the first question from the agent. If the name was, as we have proof of in this trial and otherwise, something like Candy Dolls or something that has some sort of known child pornography background, then we may have less of an idea of taint. But when it's Dark Moon here, and we know that maybe 120 people ever were on the Dark Moon, that the agent knows, and that's the signal to the person who's being interviewed at this point, Mr. Crosby, he knows about Dark Moon. And that's where the taint, I think, the proof of the taint. Is there any dispute that the access to Dark Moon was improper? We dispute that, Your Honor, because Agent Flens is looking through Mr. Crosby's e-mail from the other board, the KOFD board. So she's looking through his e-mail, finds D-Moon, and doesn't know anything about D-Moon, and then opens it up by finding passwords in his e-mail. How was she able to open it up? Where did she get the passwords? Through a search of his e-mail. And she was properly searching his e-mail, though, right? She was properly searching his e-mail. I was just curious, you know, why is it improper for her to take down and access D-Moon? What if it's an innocuous site? What if it's his Amazon Prime site? Does she get to go back and look through his e-mail to find his password, Amazon Prime, to get into all the personal information? Well, that's an interesting question because, you know, I think it's common knowledge that within the average person's e-mail there might be, there could be references to at least hundreds of different websites, some of which may be password protected, some not. Does an agent who has lawful authority to go through an e-mail then have to stop, get a warrant, go check the Amazon account, stop, get a warrant, go check the Dark Moon account? What does that look like? Well, and maybe I should have backed up. The purpose to be searching through the e-mail is to find identifying information about Mr. Crosby because we need to track him down for his illegal conduct on the KOFD board, right? It's not to continue to do an investigation about other illegal conduct he may be involved in. And I think, you know, I'm going to. But what if that illegal conduct comes to light? I mean, that's my question. What obligation is there on the officer at that point? Well, I think if it came to light through a plain view sort of idea, maybe you'd have that concern. But I think maybe you could look at cases like the Balco cases out of this court where you've set pretty strict limits to say if you're looking for one thing, here would be the identity of Mr. Crosby, then you can't have this wide, broad, open range to search for everything, every sort of illegal conduct, even if it is a computer search and there's a lot available. Well, I was just going to say the government has other arguments about why this was not there. They certainly do. Right. Yeah, and that's our disagreement, Your Honor, on that. But I would like to emphasize, and I think it's a good point, that the Dark Moon, there was no indications that Dark Moon related to child pornography just by looking at the notices from Dark Moon. And I think what the court has to do after that point is if you do find that the intrusion created a taint, is if that taint can be attenuated later on. We're saying that the taint can't because the consent, as I described with Mr. Crosby at least, the only one that we have a real clear record of, the consent was premised on the idea that the law enforcement already had information about Dark Moon at that point. And then the foreign search or seizure, again, we say is just a continuation of that chain. When we know that Mr. Crosby consents and we know about the content of the D-Moon, it's only after that we know that information or the government knows that information that they go to England to get the materials from the Internet provider and they enlist the help of the law enforcement in England to do so. If there are no more questions about the Fourth Amendment portion, I would like to move on to the venue, which I think is another one of these small connections with a man named Paul Wentzowitz in Polson, Montana, who's on the Dark Moon board for what the government admits is a two-week time period. And that slight connection, we're not saying doesn't make him guilty of being part of that conspiracy. I don't think there's any dispute about that. It's that there was a definite break at some point that he gets off the board, and I think we can document the break through the government's proof. And when he severs himself from the board, the conspiracy with him ends and can't be pushed off into the future to have other people who join later be in a conspiracy with a person who's no longer on the board. Isn't it one big conspiracy, though? Well, it is one big conspiracy, but— Then aren't you asking us to adopt a rule that says that whenever the government wants to indict a conspiracy, first it has the burden, the government has the burden of making sure that there's evidence of ongoing activity within the conspiracy on the day the indictment is handed down, within the district where the indictment is handed down? No, I think because this is an affirmative defense, it's our burden. It was Mr. Brown's burden to come in and do that. But if the government hasn't done what I just stated, then the defendant will prevail on that defense, correct? That's the rule you want us to adopt. It's possible that that's what happens if there's no proof that these folks were engaged in the conspiracy at the same time. And I don't think this is a unique rule. That's what we have all the way back from Levine, saying these are principles that have guided conspiracy law for a long time. This was once a conspiracy, though, right? You're not arguing that there was a separate conspiracy. People came in later. Separate and distinct conspiracy. I am saying that KOFD was a separate conspiracy from Dark Moon. So the whole thing wasn't your view? These guys were not all connected to their view? No, that they had common members doesn't make it one full conspiracy between the KOFD and the Dark Moon. They are two separate conspiracies. But they overlap, don't they? Some of these individuals overlap? Some of the individuals do overlap, but the purposes are different. Were the purposes of the boards different? Well, overall, the purposes are child pornographically related, but the reasoning that came out in the government's proof that Mr. Wentziewicz got off of the D-Moon board, in addition to security concerns, was the content of that board. So sometimes, just like a drug case, right? You can have a marijuana conspiracy over here and a conspiracy to distribute cocaine over here. That doesn't mean conspiracy to distribute drugs equals the same conspiracy. There may be variations within those conspiracies, and that's what I'm saying happened here, that the makeup of the two boards were different enough. And I don't want to get too far ahead there. What I'm arguing here is not that the – I mean, certainly we argued beforehand that the district court made an error by not ordering the venue issue on its face. But I think what developed at trial is that the second part of that test is that once there was a dispute about whether Mr. Wentziewicz had withdrawn or not, that then transferred that to a factual issue at trial. And that's the real error that happened here, is that you don't need to make the ruling about venue was always proper. You need to make the ruling about is this a factual issue that the jury should have been allowed to hear all of the evidence about, and they certainly weren't allowed to. As a matter of garden variety conspiracy law, wasn't Mr. Brown bound by all the activities of the conspiracy that had transpired before he joined the conspiracy? In garden variety, but once Mr. Wentziewicz makes that break, he's not bound by the activities, especially when there's no – I don't expect you to concede the point as to venue. Right. But in terms of criminal liability, Mr. Brown is liable for the acts of the conspiracy that took place before he joined the conspiracy or no? If that material was available, and what I think the proof showed at trial is that there wasn't even proof that the material that Mr. Wentziewicz had put on there was available. And liable for all the acts is an overstatement. But he – whatever agreement was made before he became a member of the conspiracy, that's the agreement he's liable for. The agreement – yes, he's liable for that agreement. I agree. But that Mr. Wentziewicz is no longer part of that agreement should have been presented to the jury, and I think that's the point I'm making here. Your time is running out. Do you want to address the last issue that happened during the course of the trial? Yes, I do. The closing argument when Haring – there was a restriction on the closing argument and that the main part of Mr. Brown's argument was that the common, contemporary, and ordinary definition of advertising may not apply to the actions that he had on this closed board. That was a factual question for the jury to decide after the judge had given – But what do you understand that the district court did? I understand that the district court said, you cannot come in and argue that the structure of the board, the closed nature of this board, meets the definition of advertisement as I've instructed the jury here. So what did you want to argue? We wanted to argue that, yes, use your common, contemporary, and ordinary understanding of advertising and see if this conduct equals advertising. Did you give them a definition to use? I did give definitions to use, yes. How did the closed nature of the board mesh with your argument as to how the jury should interpret the term advertise and notice? The closed nature of the board, I think, because what I compare it to is, suppose you form a group, like a women's group, to come in and exchange clothes, use clothes, because I don't like this style anymore, you don't like that style anymore. You come in. There's no advertising, but the group comes and meets at somebody's home in a private setting and they exchange those items. That would be the argument in this case. Doesn't the statute say notice or advertisement? It does say notice, but the government certainly charged advertisement in this case. If the PTA were to send home a flyer to all of its kids, that would be a closed universe. If it said, come to the big bake sale and carnival on Saturday involving hundreds of people, but it only went to that closed universe, that would not be an advertisement of any kind? I think you could make the argument it wouldn't be. I think the circumstances you gave certainly much more open, but I think the circumstances we had here were much more closed. You're not trying to prevail on the merits in front of us. What you're saying is the district court decided this element. I am saying that they decided that element. And we don't have to agree or disagree with the district court. You're just saying your chance to force the government to prove that element got taken away. That's right. Just like if it would be a constructive possession case and the materials, the drugs would be in a closed dresser drawer, right, in somebody's home, if there's somebody else that may have had access to that, you could still make that argument, even if you think it was not strong. And Mr. Brown was not given that opportunity to make that argument. So is the air harmless or structural? It's structural in this point because that was his defense. He made that clear to the judge, and the judge anticipated that. I mean, that's what the presentation of trial was, and that's why he restricted it. With that, I'll reserve my remaining minute for rebuttal. Okay. Your Honors, may it please the Court, Cindy Peterson from the District of Montana. I'd like to start with the advertisement argument and then work my way backwards. With regards to the advertisement, you'll notice in our briefs that we pointed out that the standard of review conflicts in the case law. We would argue that underhering the appropriate standard of review should, in fact, be an abuse of discretion. And the reason that we believe that the district court was correct in this is because what the district court was doing was determining the legal definition for advertisement. It wasn't restricting Mr. Brown's ability to argue the facts within the legal definition of advertisement. Well, the district court never gave a definition of advertisement. It did. It followed the Ninth Circuit's finding that it was the ordinary reasonable. It didn't tell the jury what the ordinary meaning is. It didn't say Webster's Dictionary defines advertisement as follows. It did not want to overstep and give anything that was beyond what was not supported by the law. And so that's why when it was... I understand that argument, okay. So Mr. Brown, in other words, proposed a legal definition of advertisement that included the closed network type thing. And the court considered that when it was reviewing the jury instructions on how to instruct them on the law and said, no, that's not what the legal definition of advertisement is, and I'm not going to let you argue to the jury that that's what the legal definition of advertisement is. But why couldn't, as counsel just argued, why couldn't he stand up there and say, look, ladies and gentlemen, here's the clear, the common ordinary meaning of advertisement. It means it's a very public kind of pronouncement. And this particular situation here, ladies and gentlemen on the jury, doesn't add up to that. It was closed. It was unique. You had to have these passwords. It was whatnot. And that, ladies and gentlemen, does not mean advertisement or advertising as the statute contemplates. What's wrong with that argument? So as it relates to the factual issues in the case, Mr. Brown did argue the facts of the case relating to advertisement. And that's in ER 485-2. Well, when I read his argument, though, I didn't see where he was able to argue the closed nature. That's right. That's right. Which seems to be his best argument. And the reason that he couldn't do that is because it's within the court's discretion to preclude arguments that are incorrect statements of the law. Why is that an incorrect statement of the law? If the standard is common sense or what have you, why is it out of bounds for the defendant to say common sense dictates that a closed board doesn't meet these requirements? Because of all of the reasons that the court found when it looked at the case law that defined notice and advertisement and when it looked at the legislative history, and it specifically asked Mr. Brown, give me a case, Supreme Court, federal, district, state, give me any authority that is going to support your position that this cannot be closed. And he couldn't do it. And so that's why the judge made that finding and made it as a legal definition and precluded that argument. But is the appellant right to worry that the judge is importing additional requirements that are not contained in the jury instructions? In other words, that there's somehow a burden on the defendant to meet a more specific definition of closed, a more specific definition of notice or advertisement that's different than the one that the jury is getting. I think that it is always incumbent on the parties to argue within the bounds of the law and the legal definitions that are given. And I think that it's within the court's right to make decisions that determine what the correct legal definitions are. And here, Judge Christensen made the finding as a matter of law that that was not the correct legal definition. And that's why he would not allow Mr. Brown to argue outside of that. But he was still able to argue the facts as it relates to whether or not they are, in fact, notices and are, in fact, advertisements. But the key fact that it was a closed system, he was not able to mention. No, that's correct, Your Honor. That's correct. With regards to venue, so the Lukashev case is the case that we have cited to the Court of the Ninth Circuit, which states that when a rational jury could not fail to conclude that the preponderance of the evidence establishes venue, then the court is justified in determining venue as a matter of law. So what the court did here is that Mr. Brown wanted to argue lack of venue due to Paul Wentziewicz's withdrawal. And the court basically took the simplest route when it was making its decisions on this, and it ruled as a matter of law that Paul Wentziewicz had not withdrawn. And he knew all of the facts. His specific findings had to do with, regardless of him requesting that his account be deleted from DMUN, that that does not take him outside of the conspiracy. That is not a definitive, decisive, positive step to disassociate with the conspiracy. He did not disavow the unlawful goal of the conspiracy. There's no question about that. And those findings are at ER 5. And what the court found when it had considered that pretrial, and then it considered what was proffered from the defendant with regards to Paul Wentziewicz's testimony, and that didn't prove otherwise. And so the court actually made the decision basing it on facts. But even if he didn't consider the specific facts of Paul Wentziewicz's withdrawal, it doesn't change the outcome in this particular case. And so we would argue that it would be harmless because, as a matter of law, the lack of venue argument was already foreclosed. And that's where we have argued that Mr. Brown joined a conspiracy that was already formed. He was bound by everything that had gone on before him, even if it was not known to him, everything that Mr. Wentziewicz had done before him. That's the Bibereau decision. And so he embraced, Mr. Brown embraced, the common purpose of the conspiracy venue had attached. And so, therefore, the court was proper in not allowing that issue, Mr. Wentziewicz's withdrawal, to go to the jury because of the fact that it would have been confusing and misleading and would have led to an argument that was not properly, should have been properly presented. I'll move to Fourth Amendment unless you have questions on venue. Okay. So with regards to the Fourth Amendment, we would start out by arguing one of the issues that has, I think, gotten glossed over a lot by Mr. Brown, which is that he lacks standing because the Fourth Amendment does not apply in this case. And that is that we are talking about the property of a non-resident alien in a foreign country. Mr. Brown did not own this board, this board that was not on a server that was within the United States. Are you talking about the D-Moon board now? That's exactly right, Your Honor. And the court made this finding at ER 18, and the review on that would be clearly erroneous. And we don't believe that that was clearly erroneous. That's the Verdugo decision that we have cited the court to. So that, in and of itself, takes away the argument on the Fourth Amendment. We have continued to argue the rest of them as well. We've argued that he has not met his burden, that there was a legitimate, reasonable expectation of privacy. We've gone through all of the arguments that he was basically a guest on someone else's board. You run the risk. We cite to the Smith v. Maryland decision that says when you are voluntarily turning over your communications and other things, then you run the risk that that person, you're assuming the risk that that person is not going to expose you. Let's put aside something like a board where there's a joint enterprise and restrict it to a single person's e-mail account or something that's maintained for the benefit of a single person. If the information resides on a server that's outside the United States, will the government's position still be the same? And that is, they could have a foreign official go in, access the server, take a look at my e-mail, and I have no right to come into a United States court and complain about it? No, Judge, because that would not be a non-resident alien. And so that's the difference. I would argue that you have more ownership rights in your e-mail account than you do with regards to this board. That's what makes this substantially different. Because Mr. Brown did not own this board. He was not the operator. He was not the administrator. I see. I take your point. He had nothing to do with that. He's just a member of the bulletin board or whatever it was. Yes, exactly. But then his standing would seem to depend more on the joint ownership or his lack of individual ownership as opposed to where the server happens to be located. I think that if you look at the Verdugo decision that I think you need both of those things. When we're talking about you're lacking standing because the Fourth Amendment doesn't apply, it is only in the situation where we're talking about a non-resident alien's property that is in a foreign country. So if we have that, which is what we had in this case, then the Fourth Amendment does not apply. Okay. And so, again, we also argue there's no legitimate reasonable expectation of privacy. Even if there was, we had valid consents from members, and we've identified that. Would you respond to counsel's argument? I had not focused on this fact before that when the agent is questioning Mr. Crosby, I think it was a she, a female, brings up Dark Moon, and there's no evidence to suggest that she had independent knowledge of Dark Moon. Yes, so what they were looking through Mr. Crosby's e-mail account based on a valid search warrant looking for evidence of child pornography. So she was in there under the original investigation under KOFD, which was a different conspiracy. We did not get to the determination about whether or not that intrusion actually violated Fourth Amendment rights. What we did get to is the fact that the taint didn't carry through. I don't believe that there actually is a Supreme Court or Ninth Circuit decision that talks about whether or not her entering that e-mail and password actually violates. Yes. But I would argue that it doesn't matter in this case, because even assuming worst-case scenario, if it was a Fourth Amendment violation, it still would not be excluded under Fruit of the Poisonous Tree because of the independent source doctrine. We still had two other consents that there's no allegation that ever referenced D-Moon or anything like that as it did to Mr. Crosby. So we still had valid consents from Mr. Bronson, Tony Bronson that you referenced, as well as Philip Morris, who voluntarily during their interview said, here, I'm also on D-Moon, here's my account and password, and then we go to the fact that we obtained it through IFAST over in the U.K. So for all of those reasons, we don't believe that there's any Fourth Amendment violation either. Are there any other questions? Thank you, Your Honor. Rebuttal. Your Honor, with requiring the defendant to point out a case law that would support his position that he could make that argument with regard to advertising, I think you have to take into account that this is a fairly new congressional act to add this advertising child pornography. So that the case law hasn't developed by the point that he gets to his closing argument, I think you can't rely on to say that's a restriction there. The closed system absolutely was prevented from arguing the closed system, and that was his one and only defense at trial, and that's what leads to the structural error. Moving on to the venue, I think the government and probably the district court have taken a position that's much too broad on this disavow idea. When you sever yourself from the conspiracy, usually the term disavow in the U.S. Supreme Court's analysis is a continuing chain, and so it's just much too broad, and I think you should look at the U.S. Supreme Court's recent decision in Smith about that. Thank you. Okay. Thank you, counsel. There's one last case that was listed on our calendar, United States of America v. Woods. It's submitted on the briefs. That ends our session for today. Thank you all very much.
judges: Paez, Bybee, Tigar